## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

MARGARET PAPPAS,

               Plaintiff,

v.

TOWN OF ENFIELD, et al.,

               Defendants.

3:08 - CV- 250 (CSH)

MAY 07, 2014

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

## I.      INTRODUCTION

Plaintiff Margaret R. Pappas, owner of a parcel of land in the Town of Enfield, brought this action against the Town of Enfield, Town of Enfield Planning and Zoning Commission ("Enfield's PZC" or "PZC"), and four Commissioners, Anthony DiPace, Jeffrey D. Cooper,  James A. Hickey, Jr., and Karen A. Weseliza, in their official and individual capacities.

Pappas alleges that a subdivision application she submitted to Enfield's PZC was improperly denied in violation of her Fifth and Fourteenth Amendment rights of due process, equal protection, and against taking of property without just compensation, enforceable under 42 U.S.C. § 1983.  She filed this federal action subsequent to a Connecticut Superior Court ruling in Pappas' favor that reversed the PZC's decision, holding that the denial of Pappas' subdivision application was "unreasonable," "arbitrary," an "abuse of discretion," and "illegal" under Connecticut Law.  *Pappas v. Enfield Planning & Zoning Comm'n*, No. HHDCV064021918, 2006 WL 3360480 (Conn. Super.

1

Ct. Nov. 3, 2006).  Following that ruling, Enfield's PZC granted plaintiff's subdivision application as proposed.

Plaintiff brought the present action in this Court for money damages and other relief under the United States Constitution and the Civil Rights Act of 1871.  Defendants previously filed a Motion to Dismiss, which this Court granted as to plaintiff's due process and takings claims, and denied as to her equal protection claim.  2010 WL 466009 (Feb. 3, 2010), *rehearing denied*, 2010 WL 2860728 (July 2, 2010).  Following discovery, Defendants now move for summary judgment on plaintiff's remaining claim, which alleges a violation of the Equal Protection Clause of the Constitution.  For the reasons that follow, the Court grants Defendants' motion for summary judgment and dismisses the remaining claim in the complaint.


## II.   JURISDICTION & VENUE

### A.   *Jurisdiction*

This Court's subject matter jurisdiction depends on "federal question" jurisdiction over the plaintiff's constitutional and federal statute claims, pursuant to 28 U.S.C. §§ 1331[1] and 1343.[2]  There is no diversity of citizenship between the parties.  Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e-5(f)(3).[3]

---

[1]28 U.S.C. § 1331 confers original jurisdiction upon the district courts "of all civil actions arising under the Constitution, laws, or treaties of the United States."

[2]28 U.S.C. § 1343(a)(4) confers "original jurisdiction of any civil action ... [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights ..."

[3]42 U.S.C. § 2000e-5(f)(3) states "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of

**B.** *Venue*

Venue is proper in this district pursuant to 28 U.S.C. § 1391.  Section 1391(b) provides that "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship" may only be brought in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).  Since all the defendants reside in this district and all the events and omissions give rise to the plaintiff's claim occurred in this district, thereby fulfilling (1) and (2) under Section 1391(b), when either alone would suffice, venue is proper in this judicial district.

**III.** **FACTS**

The facts established by the record are as follows.  Conclusory or argumentative allegations are disregarded.

**A.** *Pappas' Application*

Pappas is the owner of an approximately 21.83 acre parcel of land located north of Bridge Lane in the Town of Enfield, Connecticut, known as Town of Enfield Assessor's Map 19, Lot 10 (herein "the property").  Pl.'s Local Rule 56.2 Statement[4] (herein "Pl. 56.2 Stmt.") ¶ 1.  The property

---

actions brought under this subchapter."

[4]The defendants allege in their Statement of Facts reply brief [Doc. 95] that plaintiff's response to defendants' Local Rule 56(a)1 Statement does not comply with Local Rule 56(a)2 and the plaintiff's Local Rule 56(a)2 Statement does not meet the requirements of Local Rule 56(a)3.  To comply with Local Rule 56(a)2, the nonmovant party was required to "state[] in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 and

is zoned R-33 under the Town of Enfield Zoning Regulations, authorizing single-family residences as a permitted use. *Id*. at ¶ 4. The property borders residential lots on Bridge Lane on the south, railroad property abutting the Connecticut River on the west, land of the Town of Enfield on the north, and existing building lots at the cul-de-sac end of Meetinghouse Lane on the east. *Id*. at ¶ 2.

On or about September 21, 2005, plaintiff applied to the PZC for approval of a resubdivision plan that would establish fifteen (15) single-family residential building lots on the property, known as "Riverview Meadows Section II." Compl. ¶ 15; Pl. 56.2 Stmt. ¶ 9. The application proposed, among other things, to: 1) eliminate the current cul-de-sac at the then end of Meetinghouse Lane and extend the road west to a permanent cul-de-sac near the western border of the property, 2) establish four building lots on the extension of Meetinghouse Lane, 3) construct a new road, Rivercliff Lane, which would extend north from Bridge Lane in the same way as Meetinghouse Lane, and 4) create 11 additional lots located either on the cul-de-sac portion of Rivercliff Lane or the loop road established by the intersection of Rivercliff Lane and Meetinghouse Lane. Pl. 56.2 Stmt. ¶ 10. The plans were reviewed by plaintiff's licensed civil engineer, Timothy A. Coon, P.E., of J.R. Russo & Associates, including for compliance with applicable requirements of the Subdivision and Zoning

---

corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied." "[E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." L. R. 56(a)3. To cure the noncompliance, the defendants request the Court to deem all defendants' Local Rule 56(a)1 Statements admitted and disregard or strike the plaintiff's Rule 56(a)2 statements. While the plaintiff's filings do not fully comply with the citations requirements of Local Rule 56(a)2 and 3, this Court finds the error harmless, and the factual information helpful in the adjudication of this case. Therefore, the defendants' requests are denied.

Regulations.[5]  *Id.* at ¶ 17.

In order to provide an additional means of ingress and egress to the subdivision area, the application proposed a new road, Rivercliff Lane, intersecting Bridge Lane at a near right angle similar to Meetinghouse Lane.  Def.'s Local Rule 56.1 Statement (herein "Def. 56.1 Stmt.") ¶ 59; Pl. 56.2 Stmt. ¶¶ 3, 12.  The new road would require demolishing the existing single family residential building on the lot of 44 Bridge Lane, which the plaintiff acquired in a straw purchase, and converting 42 and 46 Bridge Lane into corner lots.  Def. 56.1 Stmt. ¶¶ 57, 59–62 & 74; Pl. 56.2 Stmt. ¶ 13.  The plaintiff proposed to give the "leftover" land from 44 Bridge Lane after the new road was installed to the adjacent property owners at 42 and 46 Bridge Lane.[6]  Def. 56.1 Stmt. ¶ 74; Ex. E (DiPace Aff. ¶ 31).

On the same date as the filing of the application, on September 21, 2005, the Enfield Wetlands Agent delivered a determination letter to the plaintiff that the Enfield Inland Wetland and Water Courses Agency had issued a jurisdiction ruling that no Inlands Wetlands or Water Courses permit was necessary for activities associated with the proposed subdivision.  Pl. 56.2 Stmt. ¶ 14.

---

[5]The PZC promulgated zoning regulations pursuant to Chapter 124 of the Connecticut General Statutes and subdivision regulations pursuant to Chapter 126 of the Connecticut General Statutes.  Pl. 56.2 Stmt. ¶ 8.  Section 3(b) of the Enfield Subdivision Regulations requires that any subdivision plans "must conform to the Enfield zoning ordinance and to the Enfield Subdivision Regulations."  Def. 56.1 Stmt.¶ 77; Doc. 32, Ex. A.

[6]Mr. Coon, the plaintiff's engineer, noted that plaintiff had offered to convey the narrow strips of property to the east and west of the proposed road on 44 Bridge Lane to the adjoining property owners.  Should the offer be declined, as indicated by the said property owners at the public hearing, those strips would be added to lots 2 and 3 of the subdivision.  Pl. 56.2 Stmt. ¶ 49 n.3.

**B.   *Commission's Deliberation and Decision***

a. Negative Public Sentiment

Plaintiff's application was officially received by Enfield's PZC at its October 6, 2005 meeting and was assigned the number PH#2526.  Pl. 56.2 Stmt. ¶¶ 15‑16.  The PZC conducted a series of four public hearings on the application, on November 3, 2005, November 17, 2005, December 1, 2005, and finally on January 19, 2006.  *Id.* at ¶ 16.  The public was vehemently against Pappas' proposed development as numerous residents in the neighborhood made negative comments before and at the public hearings, and none spoke in its favor.

Prior to the November 3, 2005 hearing, four letters were received from area residents opposing the plaintiff's proposed subdivision over traffic safety, privacy, school crowdedness, and drainage and sewage concerns.  Def. 56.1 Stmt.¶¶ 63‑70, Ex. GG.  Two letters came from homeowners with properties next to the new proposed road.  *Id.* at ¶¶ 64‑70.  Ms. Jodi Ann DeFord, who resided at 42 Bridge Lane, wrote in her letter that "Bridge Lane can not accommodate more housing in this area ... traffic is already at its capacity[;] ... the side drains and sewers [as well as] ... [t]he schools are all at capacity."  Def. 56.1 Stmt., Ex. GG.  Ms. DeFord then noted her grave personal concerns for her daughters' safety and family's privacy, and over additional taxes and costs associated with the extra 20 feet to be given to her by Pappas.  *Id.*  Ms. Michele D. White, who resided at 41 Bridge Lane, across from the new proposed roadway, at the end of the "T" intersection, also wrote to the Town on similar concerns regarding Pappas' subdivision.  Def. 56.1 Stmt.¶¶ 68‑70.  Ms. White noted that the land upon which the houses were to be built was wetlands and that the houses to be put up "will" take in water.  *Id.* at ¶ 70.

There were historic reasons for the public and the PZC's significant concerns over flooding.

6

In October of 2005, major flooding occurred in the Town of Enfield that required federal disaster assistance and inflicted extensive damages to both public and private properties – "total revised public damages [was] equal to $754,977, the 'greatest per capita assessment among Hartford County municipalities.'" Def. 56.1 Stmt.¶¶ 11, 18 & 21–22.  Many property owners sustained extensive flood damage, but did not have flood insurance to cover their losses because their properties were not located within a FEMA-designated flood plain.  *Id.* at ¶ 18.  At the October 17, 2005 town council meeting, numerous members of the public complained that they had been told that they were not at risk of flooding based upon the fact that they were not within the 100-year flood zone established by FEMA but nonetheless had experienced flooding.  *Id.* at ¶ 19.  A large portion of the flooding damage in Enfield during October of 2005 occurred in the Beaman Brook Watershed, in which the plaintiff's subdivision land is located.  *Id.* at ¶ 23.[7]  There were dozens of calls to the fire department for flooding and water-related problems during the October 2005 flood from houses that are adjacent to the subject subdivision property, including houses on Bridge Lane and Meetinghouse Lane (e.g., 44 Bridge Lane), and on the Beaman Brook Watershed.  Def. 56.1 Stmt.¶ 24–25.

The plaintiff's application was also deliberated against the backdrop of the flooding of Grand View Subdivision (#2151), a subdivision whose problems plagued Enfield's PZC and the Town Council during 2003 and 2004.  *Id.* at ¶ 27.  Grand View, a 16-lot subdivision approved on February 3, 2000, had significant flooding and drainage issues, despite not being located in a 100-year or 500-year flood zone, or a FEMA designated flood hazard zone.  *Id.* at ¶¶ 28, 31.  Similar in lot number to the plaintiff's proposed subdivision, Grand View also utilized the same engineering firm for

_____

[7]A portion of plaintiff's undeveloped land drains to Beaman Brook, but none would under the proposed plan.  Pl. 56.1 Stmt. Resp. ¶ 23.

engineering and drainage planning, and was reviewed and approved by the same Assistant Town Engineer, Mr. John Cabibbo, as occurred with the plaintiff's application. *Id*. at ¶¶ 29, 30 & 32. J.R. Russo & Associates provided their expert opinion during the review of Grand View's application, concluding that there should not be issues with flooding, unless the storm is grander than a 50-year event:

> In our opinion, the existing conditions and improvements substantially meet the requirements of the approved design plans. ... In conclusion, the proposed project will not result in an increase in peak flows to any of the design points and should not have any long term negative impacts to the existing storm drainage patterns under proposed conditions. There will actually be a decrease in peak flows [for] the 25 year and 50 year design storms.

*Id*. at ¶¶ 33–34. The subsequent flooding caused the commissioners to question the credibility of the Assistant Town Engineer and J.R. Russo & Associates, although the developer's failure to follow the grading plan established under the approved subdivision plans may have contributed, at least in part, to the flooding problems. Pl. 56.2 Stmt. ¶¶ 151–52. Thereafter, the commissioners concluded that they could not fully rely upon the opinions of these experts with regard to drainage issues, since proposed subdivisions approved by Mr. Cabibbo and/or J.R. Russo & Associates might still have serious flooding problems. Def. 56.1 Stmt. ¶ 45.

### b. November 3, 2005 Hearing

The public hearing on Pappas' application spanned four sessions, with extensive questioning by the PZC, commentary by the public, and testimony by the plaintiff's civil and traffic engineers. Much of the hearing revolved around concerns over flooding and drainage and potential issues surrounding the proposed new road. At the November 3, 2005 hearing, Chairman Commissioner

DiPace, who eventually voted against the application, and thus a defendant in this case, stated that he was concerned about the potential hardship for the abutting property owners at 42 and 46 Bridge Lane. *Id*. at ¶ 80. Echoing Commissioner DiPace, Ms. DeFord spoke in opposition of Pappas' application, stating that she bought 42 Bridge Lane, after "[driving] it for three years," for its privacy and safety, and for the fact it is not "a corner lot." *Id*. at ¶ 85. She was concerned that plaintiff's proposed new road would lead to loss of her privacy, since "her deck, hot tub, pool and shed were in her back yard," and threaten her children's safety with "people driving on the side of the lot." *Id*. at ¶¶ 83, 85. Ms. DeFord also noted that even with "two sump pumps" to combat flooding problems, "her house had just flooded." *Id*. at ¶ 84. Pete Kenney of 45 Bridge Lane complained about problems with storm drains on Bridge Lane, which for years were backing up, flooding the houses. *Id*. at ¶ 86. He believed that adding to an already antiquated system would be problematic; the same would hold true with the proposed subdivision taxing the road system, exacerbating traffic issues. *Id*. Michele White of 41 Bridge Lane expressed concerns over reduced home value and traffic safety, which in light of three accidents in the area recently, might worsen from cars on the new street coming directly toward her house. *Id*. at ¶ 88.

Three additional members of the public offered their comments. *Id*. at ¶¶ 87–91. First, Nancy Talleon of 4 Mulberry Lane, a cul-de-sac off of Bridge Lane, complained about flooding at her property despite three yard drains in her backyard; two weeks previously, she had 3 inches of water in her cellar. *Id*. at ¶ 87. Then, Michael Miller of 31 Bridge Lane voiced concerns over drainage and flooding in the area adjacent to the subdivision property, since it has had problems with water dating back to at least the 1980s. *Id*. at ¶¶ 89–90. Lastly, John Hogan of 15 Bridge Lane gave a graphic description of flooding on Bridge Lane – "like a flash flood, like a canyon" with houses

taking in water and "furniture and things [coming] out of their cellar." *Id*. at ¶ 91. "[He has] seen at least 4 or 5 horrible storms in the past 20 years." *Id*.

A number of PZC members expressed their concerns over flooding and posed related questions to the plaintiff's licensed civil engineer, Timothy A. Coon, P.E., of J.R. Russo & Associates. Pl. 56.2 Stmt. ¶ 17. Commissioner Egan, who didn't vote on plaintiff's application because his term expired at the end of 2005, noted that the land is agricultural by nature "because it floods and it was close to the river and the water table is high there." Def. 56.1 Stmt.¶¶ 93, 95. He questioned Mr. Coon's conclusion that the proposed plan would decrease flow and its underlying assumptions: "Everybody comes before us and says they are decreasing flow. Everybody. ... I didn't go through your assumptions but they are assumptions." Then, he asked about the test pits and the need to use fill to raise up the houses. *Id*. After addressing the test pits and the seasonal annual high water table, Mr. Coon presented the plan to use footing drains connected to the drainage system to alleviate any potential wet basements, in addition to raising houses. Pl. 56.2 Stmt. ¶ 26; Def. 56.1 Stmt.¶ 100. Commissioner Cooper, one of the individual defendants, inquired as to whether the cellar floors were going to be below the water table; Mr. Coon stated that some of them would be, but pointed to footing drains as a cure. Def. 56.1 Stmt. at ¶ 102. When Commissioners Cooper and Duren asked what would occur if the footing drains got clogged or collapsed, Mr. Coon responded: "[i]f that happens then you get a wet cellar and you try some other means or you dig down and you clean them out ... all I can say is [it's] standard practice." *Id*. at ¶ 103. Commissioner Duren requested that the Town Planner obtain a hydraulics study of the area so that the whole watershed could be reviewed; Commissioner Egan seconded the request. *Id*. at ¶ 105.

Plaintiff also presented her licensed traffic engineer, Steven Mitchell, P.E. of F.A. Hesketh

& Associates, who noted that the Subdivision Regulations do not require a traffic study be performed for a subdivision of this size.  Pl. 56.2 Stmt. ¶ 30.  Mr. Mitchell determined that 88 vehicle trips occurred on Bridge Lane during the 4-hour morning peak traffic period and 105 trips in the 4-hour afternoon peak traffic period.  *Id*. at ¶ 34.  Based on established standards, the proposed residential homes would add 19 trips in the morning period and 18 trips in the afternoon period.  *Id*. at ¶ 35.  Mr. Mitchell informed the Commission that traffic generated from the proposed subdivision would not result in any traffic safety and operation issues, congestion or delays.  *Id*. at ¶ 37.


c. November 17, 2005 Hearing

At the second hearing, Caroline Camay of 46 Bridge Lane, who lived in her house for 46 years, echoed her neighbors' earlier comments, citing issues with water in her current residence and concerns over traffic and having a street next to her house.  Def. 56.1 Stmt.¶ 107.  Her son, Ron Camay, noted as an example of the area's wetness, a prior attempt to put in a cellar "was a disaster. There was nothing but water."  *Id*. at ¶ 108.  Peter Kenney of 45 Bridge Lane then pointed out the historic "problems with the sewers backing up into people's homes on Bridge Lane"; he then turned to the PZC and questioned whether "it would be poor stewardship at least to add to [an already overburdened system]"  *Id*. at  ¶ 109.


d. December 1, 2005 Hearing

The discussion at the third hearing began with Commissioner DiPace's question regarding whether the entrance of the new road would create any non-conformities in relation to existing structures, requesting an opinion of counsel.  Def. 56.1 Stmt.¶ 111; Pl. 56.2 Stmt. ¶ 50.  Plaintiff's

attorney, Kenneth R. Slater, Jr., responded, conceding that "there were some existing structure that would be within the minimum setback," but deferring to plaintiff's engineer, Mr. Coons, for a substantive explanation.  Def. 56.1 Stmt.¶ 111.  Mr. Coons explained that the plans have been revised to bring in the road on a small angle to conform to the minimum 40 foot front yard setback between the proposed right-of-way line and the existing structures. *Id.* at ¶ 112.  The Town Attorney indicated he doubted that the original design would result in a zoning nonconformity, but also noted that the issue was moot based on the modifications.  Pl. 56.2 Stmt. ¶ 52.

The floor was then opened to a deluge of public comments on flooding and drainage issues, including discussions on repercussions and recourse should these concerns materialize at Pappas' development.  Michele White of 41 Bridge Lane stated that there are not only problems with drainage on the street, evidenced by the puddles that "sit[] there for days and days," but these problems have also affected her home, costing her "tens of thousands of dollars to replace many things in [her] house."[8]  Def. 56.1 Stmt.¶ 113.  Peter Kenney of 45 Bridge Lane questioned what recourse is available for homeowners in the neighborhood should Pappas' subdivision exacerbate the drainage and flooding problems. *Id.* at ¶ 115.  Jack Sheridan of Buchanan Road, Enfield, expanded on the previous comment, suggesting the need for disclosure to new homeowners that "lots are below the water level and that the foundations and curtain drains are going to be below the street drains," cautioning that there otherwise will be "litigation and the town and taxpayers will pick up the tab."

---

[8]Defendants stated earlier in their Statement of Fact ¶ 88 that Ms. Michele White was residing at 41 Bridge Lane at the time of the hearing. The Court construes defendants' later designation of her as the resident of 45 Bridge Lane in ¶ 113 as a typographic error. The Court arrived at this conclusion based on the fact that Mr. Peter Kenney is noted as the resident at 45 Bridge Lane (¶ 115), and these homes are single family residences.

*Id.* at ¶ 117.  Kathy Rothchild, the daughter of the owner of 46 Bridge Lane, asked "where is that water going to go?"  She further noted that her mother, who has lived in the house for 46 years, "has a sump pump in her cellar and it runs constantly.  As a matter of fact, right now, behind her house from the rain the other day, there's a puddle."  *Id.* at ¶ 118.  Patrick Decodo of 11 Riverview Street, Enfield, also observed puddling and surface water on the subdivision land.  *Id.* at ¶¶ 119‒20.

In response to the PZC's and the public's flooding concerns, Mr. Coon presented the stormwater management system of the proposed subdivision, in form of a drainage map.  Pl. 56.2 Stmt. ¶¶ 53‒54.  The map depicted the four separate areas of drainage on and near the land to be subdivided.  *Id.* at ¶ 55.  Mr. Coon informed the PZC that the existing Bridge Lane municipal stormwater conditions would be improved by the subdivision, because first, three new catch basins would increase the speed in which water will drain into the Connecticut River, and second, the diversion of stormwater from a portion of the property to the improved western Bridge Lane system would reduce the load on the existing Bridge Lane municipal stormwater system.  *Id.* at ¶¶ 62‒66.

e. January 19, 2006 Hearing

Mr. Coon received an email from the Town Engineer requesting plaintiff to perform an analysis on the impact of a 50-year storm on the proposed subdivision.  *Id.* at ¶ 46.  Enfield's Subdivision Regulations require demonstration of adequate stormwater management during a 25-year storm event, but allow the Town to require the applicant to submit a plan capable of handling a 50-year storm.[9]  *Id.* at ¶ 45.  The results were presented by Mr. Coon at this hearing.  *Id.* at ¶ 68.

_____

[9]Enfield's Subdivision Regulations § 5.d.1., *Disposal of Spring Water and Storm Water System in General*, provides that: "The developer shall have designed by Professional Engineer, licensed in the State of Connecticut, a stormwater drainage system that shall contain, where

Mr. Coon determined that with the exception of the final outlet flow from Bridge Lane being undersized, the existing municipal drainage system had the capacity to handle 50-year stormwater flows for the subdivided property. *Id.* at ¶ 69. As a remedy, the plaintiff agreed to increase the size of that outlet pipe, which the Town Engineer confirmed would now be adequate to handle a 50-year storm. *Id.* at ¶ 70.

Several commissioners posed follow-up questions, centered on Pappas' proposed water management system and whether the land is "subject to flooding,"[10] an important inquiry in the approval of plaintiff's application under the Subdivision Regulations. Commissioner Cooper first asked Mr. Coon: "Does the water discharge system also drain off of the water table? Are the runoff and the water table kind of one and the same?"; in response, Mr. Coon stated: "The footing drain system is going to drain the water table from around the basement. Footing drains are connected to the storm drain system." Def. 56.1 Stmt.¶ 123. Commissioner Cooper then asked: "And the whole discharge system will accommodate the rise in the water table?"; and Mr. Coon responded as follows: "Correct, it will accommodate the discharge from the footing drains if that's what you're getting at." *Id.*

---

necessary, culverts, catch basin, head walls, storm sewers, detention and retention basin and other structures or facilities suitable to give streets and adjacent lots proper drainage." That section further provides that the system should be designed to adequately "handle the run-off from a twenty-five (25) year storm." Sections 5.d.2, 5.d.3 and 5.d.4 provide that, when it is anticipated that additional run-off from a subdivision will overload an existing downstream drainage facility during a 50-year storm, the PZC shall not approve the plan unless the applicant improves the existing system to met those conditions. Doc. 32, Ex. A.

[10]Enfield's Subdivision Regulations § 3.a., *General Requirements for Subdivision of Land: Character of Land*, lays out the central tenet of Enfield's Subdivision Regulation: "All land to be subdivided shall be of such character that it can be used for building purposes without danger to health or public safety. Land *subject to flooding* or with inadequate means of sanitary sewage disposal shall not be subdivided." (emphasis added). Doc. 32, Ex. A.

Commissioner Weseliza then followed: "Without the road improvements, is this land subject to flooding? Would we say that it has a high water table subject to flooding?"; Mr. Coon responded: "It is not located within the flood hazard zone." *Id.* at ¶ 127.  Commissioner Weseliza noted that the site "kind of looked flooded" when she visited on the day of the hearing, and she observed that a significant portion of the subdivision land was covered in water, including frozen water near the intersection of Meetinghouse Lane and Bridge Lane.  Pl. 56.2 Stmt. ¶ 72; Def. 56.1 Stmt. ¶¶ 128–29, 143.  She subsequently asked Mr. Coon if that would be considered a flood, which Mr. Coon responded: "There could easily be standing water out there after the rains that we've had. I wouldn't be surprised if there is standing water out there but it is a relatively flat lot at this point and there is standing water in many areas."  Def. 56.1 Stmt. ¶ 129.  Commissioner Weseliza then pointed to Enfield's Subdivision Regulations: "[W]ell, I ask only because in the character of the land [subsection,] it says land subject to flooding or with inadequate means of sanitary sewage disposal shall not be subdivided."  *Id.*  Mr. Coon stated in response: "[l]and subject to flooding I believe is defined as land which falls within the 100-year flood zone"; he does not believe the plaintiff's property "would qualify as land subject to flooding."  *Id.*  Mr. Coons subsequently explained that visible puddling on or near Meetinghouse Lane was in a low area not part of the proposed subdivision, the Perillo property, and was the result of nonconforming construction; Mr. Coons also informed the PZC that plaintiff was placing a drain in the area to alleviate puddling.  Pl. 56.2 Stmt. ¶¶ 74–75.  Moreover, Commissioner Jones pressed the plaintiff's attorney on a definition of "subject to flooding," to which Attorney Slater responded without defining the term.  Def. 56.1 Stmt. ¶ 130.

Basing his concerns in part on observations of large areas of ponding and puddling on multiple occasions on the subject property during the pendency of the application, Commissioner

DiPace also probed Mr. Coons on the subdivision land's past floods and its potential for more flooding. Def. 56.1 Stmt. ¶¶ 131, 142. In response, Mr. Coons stated: "There may be ponding of water but this particular land is not within any area that is regulated as a 50-year or 100-year flood zone." *Id.* at ¶ 131. The subdivision regulations, however, do not define "land subject to flooding" as land which falls within a 100-year flood zone or as land located within the flood hazard zone. *Id.* at ¶ 140.

When the floor opened to public comments, several residents spoke against plaintiff's application, reiterating their earlier concerns over flooding and traffic safety. Thomas Tyler, an attorney who lived in the corner lot house 18 Bridge Lane for approximately 30 years, noted that vehicles coming around the corner have "gone on [his] property, ... knocked down [his] basketball pole, ... hit two of [his] vehicles and knocked one of them into the garage. Fortunately, this occurred at night so that no one was out in the yard at the time. ... [This happened] 3 or 4 times over the last 15 or 20 years." *Id.* at ¶ 133. He was not only concerned with traffic safety over the two new corner lots with less than 100-foot setback, but also with the effects on general health, welfare and safety of the "strip[s] of spite land" separating the proposed road and the neighboring corner lots. *Id.* He was worried about the impact on Bridge Lane's "long established residential nature in character that extends back 80 years," which many of the residents moved there and built up their homes in reliance. *Id.* at ¶ 135. Mr. Tyler then presented copies of deeds for 42, 44 and 46 Bridge Lane claiming that they contained private deed restrictions therein limiting use to residential use. *Id.* at ¶ 134. Afterwards, Kathy Rothchild, the daughter of the owner of 46 Bridge Lane, confirmed the earlier noted observations of pooling of water on the plaintiff's property: "[T]he little cul-de-sac ... was considerably under water yesterday as was out in the field. ... I went there about 5 or 6 hours

[after heavy rain stopped] ... there was water standing everywhere." *Id.* at ¶ 136. While Meetinghouse Lane itself was dry, "there was a good 20 feet to 30 feet wide of water ... in the field." *Id.* at ¶ 138. This hearing closed the public discussion on the plaintiff's application. *Id.* at ¶ 139.


     f. Zoning Board Final Decision

     On February 16, 2006, the PZC rendered its decision on plaintiff's resubdivision application. Pl. 56.2 Stmt. ¶ 79. The PZC first considered the issue of the sidewalk requirement. Commissioner Duren made a motion to waive the requirement, but the motion failed by a vote of 7 to 0, with Commissioner Duren conceding that "sidewalks are needed in a development."[11] Pl. 56.2 Stmt. ¶ 81; Def. 56.1 Stmt. Ex. MM (transcript for Feb. 16, 2006 Enfield's PZC meeting). The PZC then voted unanimously to accept a fee in lieu of the dedication of open space. Pl. 56.2 Stmt. ¶ 82.

     The PZC next deliberated on the resubdivision approval. Commissioner Duren stated that although he agreed with some concerns of the public, he finds that the plaintiff's application "have met or exceeded the requirements of the Subdivision Regulations," sufficient to justify approval. Def. 56.1 Stmt. Ex. MM, p. 9. Chairman DiPace noted he has "looked long and hard" at the application, but cannot overlook a number of issues that were raised at the public hearings: tearing down the house would damage a neighborhood (e.g., aesthetics, privacy, traffic safety, and lower housing prices for the new corner lots) and the high water table and close proximity to the Connecticut River would pose a flooding risk. *Id.* Chairman DiPace concluded that "I don't think

---

[11]Enfield's Subdivision Regulations § 3.c., *Waiver Procedure and Vote on Subdivision Plan*, allows the PZC to waive certain requirements under the regulations by a three-quarters vote of all members of the PZC. The subdivision applications, however, are approved by a simple "majority vote of those members present and voting." Doc. 32, Ex. A.

1 agree that you can put fifteen houses in there and not adversely affect the rest of the neighborhood." *Id.* The PZC denied Pappas' application: 3 members, Commissioners Ballard, Duren, and Jones, voted in favor of approval and 4 members, Commissioners DiPace, Cooper, Hickey, and Weseliza, voted against. *Id.*

The four commissioners who voted against Pappas' application, now defendants in this case, summarized their rationale for denying the application subsequently in their depositions. Chairman DiPace's reasons for denial were drainage concerns, impacts to the neighborhood with the demolition of a house, creation of two corner lots and traffic safety issues, and neighborhood aesthetics relating to privacy. Pl. 56.2 Stmt. ¶ 91. Commissioner Cooper voted to deny the application because of water table issues, downstream flooding issues, off-site impacts of water, and the creation of corner lots. *Id.* at ¶ 92. Commissioner Hickey denied the application for the same reasons as those identified by Chairman DiPace at the February 16, 2006 meeting, and because he believes the creation of a street off Bridge Lane would negatively impact the adjoining properties and harmony with the neighborhood characteristics. *Id.* at ¶ 93. Commissioner Weseliza justified her vote on the grounds of water issues, neighborhood harmony disturbance, opposition by neighbors, creation of corner lots and spite strips. *Id.* at ¶ 94. The four commissioners based their decisions upon the overwhelming public opposition, the unsatisfactory responses of the plaintiff's engineer on their flooding and drainage inquiries,[12] the adverse effect on the character and harmony of the

---

[12] The four commissioners did not believe that the plaintiff adequately addressed whether the subdivision property was "land subject to flooding" under the Subdivision Regulations. Def. 56.1 Stmt.¶¶ 144–45, 147. They were also not convinced that plaintiff had established that off-site or on-site flooding problems would not be exacerbated by the development and the proposed drainage system would have the capacity to handle water from the sump pumps or curtain drains in conjunction with other stormwater simultaneously draining through the system. *Id.*

neighborhood,[13] concerns over traffic safety,[14] and fairness to owners of 42 and 46 Bridge Lane.[15]

Def. 56.1 Stmt. ¶¶ 144–52.

## C.  *State Court Litigation*

Plaintiff subsequently filed an administrative appeal of the PZC's decision with the

Connecticut Superior Court, in the matter of *Pappas v. Enfield Planning & Zoning Commission*.

2006 WL 336480.  The Connecticut Superior Court sustained the appeal on the basis that "nothing

in the record provided a reasonable basis for the Commission's action" and that it was "arbitrary" for

the PZC "[to] ignor[e] the opinions of the only two experts on storm water drainage, flooding etc."

*Pappas*, 2006 WL 336480 at *6.  The Connecticut Superior Court ruled that the denial of plaintiff's

application was "unreasonable, illegal, arbitrary and [a]n abuse of the Commission's discretion," and

ordered the PZC to approve plaintiff's application.  *Id.*  Following the decision of the Superior Court,

the Commission granted plaintiff's resubdivision application as proposed.  Compl. ¶ 34.

---

[13]Enfield's Subdivision Regulations § 5.b.1. requires "Streets in any subdivision shall be in harmony with existing or proposed thoroughfares ... especially with regard to safe intersections ... preserves to the greatest extend possible the natural, terrain, trees and other significant natural, man-made, and scenic features ... so that a safe, convenient circulation system is provided in the opinion of the Commission."  Doc. 32, Ex. A.

[14]Enfield's Subdivision Regulations § 5.b.1. permits the denial of a subdivision where unsafe intersections would be created or where a "safe, convenient circulation system" is not established "in the opinion of the Commission."  Doc. 32, Ex. A.

[15]The defendant commissioners believed that approving the subdivision would have been unfair to the owners of 42 and 46 Bridge Lane, because not only would the new road turn their parcels into less desirable and less valuable "corner lots" under the Zoning Regulations, but they were also presented with the dilemma of having to either accept the proposed strips of land adjacent to their property, and thereby taking on property tax and maintenance obligations, or reject the strips of land and instead face issues of inadequate maintenance or placement of unwanted shrubbery, trees or other unwanted use of said property.  Def. 56.1 Stmt.¶ 149.

### D.   *Federal Court Litigation*

Plaintiff then filed this action under 42 U.S.C. § 1983 on February 15, 2008, alleging due process and equal protection violations, and seeking money damages and punitive damages, as well as attorney's fees and costs.   In her complaint, Pappas specifically alleged that the defendants deprived her of "equal protection, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983," in that defendants "acting under the color of law, singled out the plaintiff for unfair and illegal treatment,"  when they "intentionally, improperly and in bad faith, treated the plaintiff differently than other similarly situated persons and with no rational basis for the different treatment."  Compl. ¶ 43–45.  Since the plaintiff has later admitted that the defendants' denial of her application was not based on "personal dislike" or "ill will" toward the plaintiff [Def. 56.1 Stmt. ¶ 173; Pl. 56.1 Resp. ¶ 173], and has provided no evidence to the contrary, this Court construe the admission as a voluntary abandonment of its allegation of malice in the context of equal protection.[16]

In its earlier ruling on defendant's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), 2010 WL 466009, the Court dismissed the plaintiff's substantive due process claim with prejudice, on the grounds that the plaintiff did not have a constitutionally protected property interest in the granting of her application, because Enfield's Subdivision Regulations vested the PZC with discretion in its

---

[16] The majority opinion in *Olech* chose not to include malice or animus in the "class of one" equal protection standard. *Vill. of Willowbrook v. Olech.* 528 U.S. 562, 565; 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499–500 (2d Cir. 2001) (affirming appellant's reading that *Olech* removed "the requirement that malice or bad faith be shown in order to state a valid 'class of one' equal protection claim."). Therefore, as a matter of law, this Court does not need to consider malice as part of its analysis for a "class of one" claim.

review of subdivision applications.  This Court also dismissed the taking of property claim, which the plaintiff had voluntarily withdrawn, without prejudice.  The only remaining claim is equal protection, which this decision will address.


IV.  **DISCUSSION**

A. ***Standard for Summary Judgment***

The criteria for granting or denying summary judgment are well established.  Summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001).  In other words, "the court must resolve all ambiguities and draw all inferences in favor of the non-moving party." *Alberti v. Town of Brookhaven*, 876 F. Supp. 2d 153, 160 (E.D.N.Y. 2012) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 137 (2d Cir. 1998)).

Nonetheless, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of West Hartford*, 288 F.3d

467, 470 (2d Cir. 2002) (quoting *Celotex Corp.*, 477 U.S. at 324).  To satisfy its burden of proof, the [nonmoving] party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence in support of its factual assertions." *Gryphon Dev. LLC v. Town of Monroe*, No. 08 Civ. 3252, 2009 WL 4288202, at *3 (S.D.N.Y. Nov. 30, 2009) (quoting *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir. 1998)); *see also Harlen Assocs.*, 273 F.3d at 499 ("[M]ere speculation and conjecture is insufficient to preclude the granting of the motion.")

It is generally held that in fact-intensive cases such as this one, a trial court should not entertain or adjudicate motions by either party for summary judgment until all discovery has been completed.  *See, e.g.*, *Hellstrom v. U.S. Dept. Of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). "[S]ummary judgment should only be granted if after all discovery, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Id.*  In the case at bar, the voluminous record created by discovery allows the Court to properly consider the merits of defendant Town of Enfield and its affiliates' motion for summary judgment to dismiss plaintiff Pappas' complaint.

**B.   *"Class of One" Equal Protection***

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs.*, 273 F.3d at 499.  While the prototypical equal protection claims are based on membership in a protected class, often vulnerable to discrimination, the Supreme Court formally recognized over a decade ago the "class of one" equal protection claim in *Vill. of Willowbrook v. Olech*. 528 U.S. 562, 564; 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *Harlen Assocs.*,

273 F.3d at 499; *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *rev'd on other grounds;*[17]

*Reardon v. Keating*, No. 3:11 CV 01092, 2013 WL 5818812, at *28 (D. Conn. October 29, 2013).

*Olech* held that "where the plaintiff did not allege membership in a class or group," he may

nonetheless seek equal protection if he has been "intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564.

By preventing individuals who do not fit neatly into a recognized class from falling through the

cracks, the Supreme Court established the "class of one" claim "to secure *every* person within the

State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express

terms of a statute or by its improper execution through duly constituted agents," the very purpose of

the Equal Protection Clause of the Fourteenth Amendment. *Id*. (emphasis added).

　　　However, courts must balance the expansive coverage of the equal protection doctrine with

potential interference in government activity. As the Second Circuit said in *Harlen* "we are mindful

of the general proscription that 'federal courts should not become zoning boards of appeal to review

non-constitutional land[-]use determinations by the [C]ircuit's many local legislative and

administrative agencies.'" *Harlen Assocs.*, 273 F.3d at 502 (quoting *Zahra v. Town of Southold*, 48

F.3d 674, 679–80 (2d Cir. 1995)). A federal court's function is to protect individuals and groups

against intentional discriminatory and disparate treatment, not to oversee the operations of local

governments and agencies. The law must minimize the danger of every dissatisfied landowner

making a claim against their local zoning boards and government agencies and against the individual

commissioners and regulators, under the pretense of equal protection–a perverse incentive that

---

[17]*See Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 n.1 (2d Cir. 2010)
(*Neilson*'s articulation of the elements of a "class of one" equal protection claim remains good
law.)

Justice Breyer was deeply concerned with in his concurrence to *Olech*.  528 U.S. at 565‑66.

    a. Similarly Situated

    Rather than inserting a malice requirement, as Justice Breyer urged in *Olech* to prevent "transforming run-of-the-mill zoning cases into cases of constitutional right," the "class of one" equal protection doctrine has instead adopted an extraordinarily high burden of proof for the "similarly situated" requirement.  *Id.*  Just as the *Cordi-Allen* Court noted, quoting Justice Breyer:

> The "similarly situated" requirement must be enforced with particular rigor in the land-use context because zoning decisions "will often, perhaps almost always, treat one landowner differently from another." ... Given this template, virtually every zoning decision – in the absence of a sensible limiting principle – would be a candidate to find its way to federal court in the guise of an equal protection claim ... The "similarly situated" requirement furnishes the limiting principle that guards against such a devolution.

*Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (internal citation omitted); *see also Pansy Road, LLC v. Town Plan & Zoning Comm'n of Town of Fairfield*, No. 3:05–CV–916, 2007 WL 2889456, at *2 (D. Conn. Sept. 29, 2007).

    Thus, in order to ultimately prevail on a "class of one" equal protection claim, the plaintiff bears the burden of showing "an extremely high degree of similarity between themselves and the persons to which they compare themselves."  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); *see also Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010); *Neilson,* 409 F.3d at 104; *Mihaly v. Town of Trumbull Water Pollution Control Auth.*, No. 3:12–cv–1157, 2013 WL 2948329, at *3 (D. Conn. June 14, 2013); *Reardon*, 2013 WL 5818812, at *29; *Pansy Road*, 2007 WL 2889456, at *2.  The comparison with others of an "extremely high degree of similarity" is used as an indicator of the decisionmarkers' intention to discriminate and

their awareness of disparate treatment. *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 143

(2d Cir. 2010); *Aliberti*, 876 F. Supp. 2d at 163.  As now-Justice Sotomayor explained in *Clubside*,

> [T]he existence of persons in similar circumstances who received more favorable
> treatment than the plaintiff in a class-of-one case is offered to provide an inference
> that the plaintiff was intentionally singled out for reasons that so lack any reasonable
> nexus with a legitimate governmental policy that an improper purpose—whether
> personal or otherwise—is all but certain.  Accordingly, to succeed on a class of one
> claim, a plaintiff must establish that (i) no rational person could regard the
> circumstances of the plaintiff to differ from those of a comparator to a degree that
> would justify the differential treatment on the basis of a legitimate government
> policy; and (ii) the similarity in circumstances and difference in treatment are
> sufficient to exclude the possibility that the defendants acted on the basis of a
> mistake.

*Id*. (internal quotation omitted).   In *Neilson,* the Second Circuit adopted the Seventh Circuit's

standard in *Purze* – requiring the comparator(s) to be "*prima facie* identical." 409 F.3d at 105; *Purze*

*v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (emphasis in the original); *see*

*Reardon*, 2013 WL 5818812, at *30.   Then in *Ruston*, the Second Circuit applied a similarly

stringent standard to the land use context – properties must be "so similar that no rational person

could see them as different."[18]   610 F.3d  at 60; see *Reardon*, 2013 WL 5818812, at *30.

How is the question of similarly situated decided in the summary judgement stage?

"Generally, whether parties are similarly situated is a fact-intensive inquiry." *Clubside*, 468 F. 3d

at 159.  As noted in *Harlen*, such factual comparisons should be submitted to the jury as a general

rule, but the rule is not absolute.  273 F.3d at 499 n.2.   "[A] court can properly grant summary

judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Id.*

The Second Circuit reiterated and formalized this standard in *Clubside*, citing the *Harlen* court's

---

[18]The First Circuit in *Cordi-Allen* spoke to the same effect: "This requirement demands
more than lip service. It is meant to be a very significant burden."  494 F.3d at 251.

observation that "a court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Clubside*, 468 F.3d at 159. Essentially, comparison by the plaintiff with others effectively identical is necessary for a "class of one" equal protection claim to survive summary judgement. The *Clubside-Harlen* standard for summary judgment in a "class of one" claim has been widely followed by the Second Circuit and the district courts in New York and Connecticut. *See Ruston*, 610 F.3d at 60; *Reardon*, 2013 WL 5818812, at *31–32 (D. Conn.); *Aliberti*, 876 F. Supp. 2d at 164–65 (E.D.N.Y.); *Gryphon*, 2009 WL 4288202, at *5 (S.D.N.Y.); *Pansy Road*, 2007 WL 2889456, at *2 (D. Conn.).

In the case at bar, since the plaintiff does not allege membership in a protected class, her equal protection allegations will need to proceed under a "class of one" claim. The plaintiff argues that there is "a genuine question of fact as to whether she was disparately treated than comparators who submitted such a certified plan and were approved," including several located in flood zone and have experienced flooding. Doc. 87, p. 27–28. The plaintiff contends generally that "at least from 1999, [the PZC has] never denied a subdivision based on the inadequacy of the stormwater management when an engineer certifies that the design meets established engineering standards." Doc. 87, p. 28. The plaintiff follows with other conclusory allegations on her application being treated differently from "numerous other administratively approved plans situated in exactly the same fashion," without providing any specifics on these "numerous other ... plans." *Id.* at 35.

In the plaintiff's Local Rule 56.2 Statement, the plaintiff again notes in summary fashion: "from 1999 to the present ... the Commission has approved several subdivision applications for properties located in floodplain designated areas," "never denied and/or conditionally approved a

subdivision application based on groundwater levels," never based a decision on "the existence of seasonal high groundwater at a level at or above a basement floor," "authorized subdivision lots where building foundations can be constructed below seasonal groundwater levels at every approved subdivision lot." Pl. 56.2 Stmt. ¶ 175–78.

To support these generalized and essentially conclusory assertions, the plaintiff references Exhibit A of "Exhibit 1: Affidavit of Margaret R. Pappas" [Doc. 88], a listing of "subdivision applications and several special use permit applications filed with the Town of Enfield from 1995 through 2010." Pappas Aff. ¶ 6. That listing provided only the most basic information on the applications, including the file number, name of applicant, use (a short descriptor that included the type of application, lot number, and/or name and phase of project), results of the vote, coordinates on the Town's map, the street location, and application date. Pappas Aff., Ex. A.[19] The plaintiff further alleges that plaintiff is similarly situated to each of the subdivisions in the list "with respect to ground water considerations, because each of those subdivision approvals authorized construction of single family homes with below-grade foundations while Plaintiff's was denied on that basis," "in that they involved properties located within the Town of Enfield and all proposed the use of land as single-family residential building lots in a residential zone," and because they "like the Plaintiff's Application, satisfied all of the specific requirements of the Subdivision Regulations and were approved on that basis."[20] Pl. 56.2 Stmt. ¶¶ 181, 184 & 185.[21]

---

[19]Exhibit A is illegible as submitted by plaintiff. The Court takes notice that it is the same list as defendant's Local Rule 56.1 Statement, Exhibit J.

[20]Plaintiff's reasoning is circular with respect to using this listing of features that were deemed approvable, but did not lead to the approval of the plaintiff's application, to demonstrate disparate treatment from those similarly situated. The plaintiff presumes that these features should direct the result of approval, when many other factors might be at play in the PZC's

The plaintiff also submitted an edited list of the subset of approved applications located in a 100-year and/or 500-year FEMA flood zone, again without supplying any details beyond the basic information. *Id.* at ¶ 182.

The only comparators specifically discussed and referenced by name and/or application number in the plaintiff's Local Rule Statement are Ridgewood Homes of Connecticut, LLC (PHN002536 & PHN002537) and "subdivisions that created Katie Lane (PHN2040), Salerno Drive and Rebecca Drive ... and the Shaker Heights Subdivision." *Id.* at ¶¶ 183, 186 & 200. But the descriptions are shallow, without the details necessary to demonstrate that they are virtually identical to the plaintiff's application. The plaintiff cites Ridgewood Homes for the proposition that the PZC approved a subdivision despite having determined that the area suffered from substantial flooding, and Katie Lane (PHN2040), Salerno Drive, and Rebecca Drive subdivisions for approval despite creating new roads next to residential dwellings, turning them into corner lots. *Id.*[22]

Not only do the plaintiff's submissions lack sufficient details on the proposed comparators for this Court to make a proper determination, but her approach of cherry-picking features of different applications to support her propositions is fundamentally flawed. The standard requires that *each* comparator to have an "extreme high degree of similarity" or be "prima facie identical" to the plaintiff's application in order to be considered similarly situated, so that no rational person would deem the plaintiff's application and comparators different (citations omitted, emphasis added).

---

decision, and thus would defeat a showing of similarly situated.

[21]Plaintiff mislabeled ¶ 185 as "165." Accordingly, this Court will cite to what based on the order of the paragraphs should be ¶ 185.

[22]Plaintiff did not provide the relevance of Shaker Heights Subdivision, besides referring it in her affidavit and attaching its site development plan as Exhibit B.

Otherwise, these comparators may have other characteristics that would lead to differences in outcome that are not the result of intentional discrimination or disparate treatment, effectively defeating the purpose of the test.  A one-to-one comparison is required to control for other variables that would lead to differing treatment.  The Second Circuit and district courts in this Circuit have considered factors such as lot size, density of buildings, types of housing, temporal disparity, and composition of decision-making boards important for the determination of similarly situated.  *See, e.g.*, *Clubside*, 468 F.3d at 159‒60; *Mihaly*, 2013 WL 2948329, at *3; *Aliberti*, 876 F. Supp. 2d at 165; *Gryphon*, 2009 WL 4288202, at *5; *Pansy Road*, 2007 WL 2889456, at *2.  This Court cannot determine based on the available facts whether the plaintiff's application is virtually identical to the alleged comparators on most of these factors.

The defendants argue that the plaintiff's application is "unique," which is to say, without similarly situated comparators.  Doc. 75, pp. 31‒35.  Addressing an issue upon which plaintiff bears the burdens of proof and persuasion, the defendants identify specific comparators with sufficient detail to allow the Court to make a determination whether the facts of the matter would support a "class of one" claim.  The defendants methodically break down the universe of potential comparative applications, identifying 15 other applications voted upon during the period when all four individual defendants were regular members of the PZC.  *Id.* at 31.  Then, the defendants note that 7 of these applications are post-Grand View and October 2005 floods.  *Id.* at 32.  Of those, only 3 applications received any public comments; among those only one is a subdivision application for more than 7 lots with a new proposed road.  *Id.*  The Cherry Wood Estates Second Phase (PHN002627) resubdivision application (thereafter "Cherry Wood") is for 16 lots, filed on November 15, 2007.  Def. 56.1 Stmt., Ex. J.  However, as the defendants allege, Cherry Wood is different from Pappas'

application because it did not involve the demolition of a home to create a new road, there was no issue of high ground water table, three of the four defendant commissioners did not vote or participate in the hearing (Commissioners Hickey, Weseliza, and Cooper), and the application was voted on after the State Court's decision on Pappas, reversing the PZC's prior determination.  Doc. 75, p. 32.  The defendants then expanded the time frame to include the period when all the defendant commissioners were regular or alternate members: only 6 applications involved 7 or more lots.  *Id*. at 33.  Among them, excluding Cherry Wood and the two filed by Pappas, none involved the creation of a new road.  *Id*.  Applications 2323 and 2565 only had 7 lots; applications 2308 and 2323 did not have all the defendant commissioners voting; application 2308 had no public opposition; and application 2565 was in a wooded agricultural area not densely populated.  *Id*.

Lastly, defendants stress the seemingly undisputed factors that there has been "no prior or subsequent subdivision or resubdivision application in the Town of Enfield," while any defendant commissioner was a member, which involved: "the demolition of an existing single family home ... for a subdivision roadway," "placement of ten or more homes in an area with as high a water table," "as much evidence that the land was subject to flooding," "as much public opposition" over flooding, drainage, and other issues, and "failed to adequately respond to commissioner questions [on] drainage and/or flooding issues." *Id*. at 34.

The Court approves the methodology employed by the defendants to identify similarly situated applications.  The Second Circuit "has determined that the size and number of lots are relevant factors to consider in assessing the similarity between two property owners who are both applying for the same type of permit." *Gryphon*, 2009 WL 4288202, at *5 (citing *Clubside*, 468 F. 3d at 159).  *Clubside* deemed projects involving "different types of housing and density level" not

similarly situated, then referring to *Purze*'s holding, noted neither does comparator developments "[not having] the same layout" or "[seeking] the same variances from the planning board." *Clubside*, 468 F.3d at 160 (internal citation omitted); *see also Landmark Dev. Grp., LLC v. Town of East Lyme*, 374 F. App'x. 58, 60 (2d Cir. 2010) (high intensity, multi-family development of 600 units is considered not sufficiently similar to plaintiffs' proposed residential development of approximately 1,700 units) (internal quotations omitted); *Aliberti*, 876 F. Supp. 2d at 165 (lots with less percentage of variance from the requirement and lots already in existence at time of seeking construction variance are not virtually identical).   7 lots is less than half of the 15 lots requested by Pappas' application, a suitable cutoff for what would be considered "extremely similar."  Indeed, the plaintiff does not dispute the criteria of 7 or more lots.  Doc. 94, p. 9; Def. 56.1 Stmt. ¶ 190.  For the same reason, the fact that application 2565 was in a wooded agricultural area sparingly populated would make it unsuitable as a comparator to a development such as Pappas' with higher housing density.

Differences between the compared applications, even in minute details, may impact the decision of a zoning board, and thus would defeat a showing of similarly situated.  The comparators need to be "identically situated in all relevant respects rationally related to the government's mission." *Purze*, 286 F.3d at 455; *see also Mihaly*, 2013 WL 2948329, at *3 (comparator having similarly low elevation as the plaintiff's property is a key factor to be considered similarly situated). Following this principle in *Pansy Road*, Judge Chatigny of this Court rejected the plaintiff's proposed comparators – "two other subdivisions in Fairfield located on cul-de-sacs serviced by roads that also provide service to nearby school" – over differences on the placement of parking and traffic flow patterns created by road structures.  2007 WL 2889456, at *2.  He reasoned "[i]n one case, parking is not permitted on the service road, and school traffic exits onto a different road; in the other,

subdivision traffic does not exit onto the road where the school's main entrance and exit is located."

*Id*.  Judge Chatigny concluded, "given these significant differences relating to traffic safety, plaintiff's equal protection claim must fail as a matter of law."  *Id*.  In the case at bar, the proposal for a new road and factors that may contribute to flooding, such as high water table, were central considerations in the PZC's deliberation and primary targets of the public's commentary.  Therefore, any subdivision that lack these features would not met the stringent standards of "similarly situated."

The timing of the application is also an important consideration in selecting comparators. Temporal disparity may undermine a potential similarly situated comparator, because nondiscriminatory reasons, such as policy change or a intervening event, may explain the difference in treatment over time.

> In the land-use context, timing is critical and, thus, can supply an important basis for differential treatment.  Since zoning bylaws, environmental standards, and licensing criteria may change over time, courts must be sensitive to the possibility that differential treatment – especially differential treatment following a time lag – may indicate a change in policy rather than an intent to discriminate.  Consequently, the most reliable comparisons are likely to be from roughly the same time frame.

*Cordi-Allen*, 494 F.3d at 253 (citing *Purze*,  286 F.3d at 455); *see also Clubside* 468 F. 3d at 160 (the plaintiff's successful state court suit, reversing the Board's decision, may be a valid basis for change in policy or differential treatment); *Gryphon*, 2009 WL 4288202, at *5 (holding as not identical, comparator lots that were granted before the Town imposed a mortarium on outside user agreements for sewage connection, which the plaintiff sought, and the commencement of a lawsuit prohibiting the sale of additional sewer treatment capacity by the Town).  In the case at bar, the October 2005 and Grand View floods, which caused significant damage to individual homes and grave economic loss, are pivotal events that materially altered the views of Enfield's PZC and the local community

on stormwater management, precipitating a more cautious approach to new applications in areas potentially subject to flooding. Likewise, the overturning of PZC's decision on Pappas' application by Connecticut's state court may change the PZC's perspective and policy on similar matters, except perhaps in the opposite direction. Thus, applications determined prior to the Grand View and October 2005 floods and those after the state court ruling in Pappas (e.g., Cherry Wood) have a material temporal difference that would defeat a showing of similarly situated.

Since the allegation of disparate treatment originated from the decision of the four commissioners who voted against Pappas' application, and the four commissioners are also individual defendants to the matter, comparable applications would not be considered *prima facie* identical or exhibiting a high degree of similarity unless they have been decided by these four commissioners. *See Purze*, 286 F.3d at 455 (comparators "submitted their plats during different time periods; and had their plat requests granted by different and previous Boards" are not similarly situated). Therefore, an application like Cherry Wood, where Commissioners Hickey, Weseliza and Cooper, three of the four defendant commissioners, did not vote or participate in the hearing would not be considered sufficiently similar to the plaintiff's application.

Even assuming *arguendo* plaintiff has fulfilled her burden to specify how her application was similarly situated to those of other developers approved by Enfield's PZC, this Court agrees with the defendants that the other subdivision or resubdivision applications do not demonstrate the "extremely high degree of similarity" required by this Circuit, laid down in *Clubside*, or the "*prima facie* identical" adopted from Seventh Circuit's *Purze*, for a successful "class of one" *Olech* claim. These undisputed facts, developed during discovery and the parties' more recent submissions, demonstrate that the plaintiff is unable to show – or at least has not shown – that there are other real

estate developments similarly situated, with an extremely high degree of similarity or *prima facie* identical, from which this Court could base the inference that there was intentional disparate treatment against this "class of one" plaintiff, in violation of the Constitution's guarantee of equal protection of the laws.  In consequence, plaintiff has failed to prove the "similarly situated" prong of her equal protection claim, and the defendants are entitled to judgment as matter of law.


      b. Rational Basis

      This Court's decision to grant summary judgment to the defendants rests on not only the plaintiff's failure to prove the first prong of her "class of one" equal protection claim, but also her inability to demonstrate the PZC did not have rational basis for their decision to deny her application. A successful equal protection claim requires the "class of one" plaintiff to demonstrate that he has been (1) "intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564; *Gryphon*, 2009 WL 4288202, at *4; *See also Clubside*, 468 F.3d at 159.  The plaintiff contends that the commissioners lacked rational basis to deny the plaintiff's application over flooding concerns, when the plaintiff has met the regulatory requirements by submitting a design capable of handling a 50-year storm, certified by a civil engineer and ratified by the Town Engineer.  Doc. 87, p. 27–35.  The plaintiff further asserts that the defendants' decision was based on "its classification that the storm water system designed to meet a 50-year storm was somehow inadequate, that the land could not be used for residential building lots because of ground water levels, and that the residential subdivision in the residential neighborhood was not in harmony with the adjoining neighborhood."  Doc. 87, p. 32.  The defendants refute the plaintiff's arguments by asserting that there were "multiple rational grounds"

supporting the PZC's denial of the plaintiff's application, including failures to address concerns over flooding and drainage, traffic safety, character of the neighborhood, and overwhelming public opposition to the same.  Doc. 94, p. 4–5; Def. 56.1 Stmt. ¶ 144–52.

The *Gryphon c*ourt summarized the standards for a successful equal protection claim under rational basis in the Second Circuit:

> A plaintiff bringing a class of one equal protection claim must also show that there was "*no rational basis* for the difference in treatment" that plaintiff received.  To demonstrate a "rational basis," a court need only find that "there is *any reasonably conceivable state of facts* that could provide [a] rational basis" for the decision, and no violation of equal protection has occurred.  Only when a land use board acts with "no legitimate reason for its decision" can a "class of one" claim proceed.  When examining such a decision for the existence of a rational basis, "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it ... whether or not the basis has a solid foundation in the record."  Indeed, the government's decision is accorded a strong presumption of constitutionality.

2009 WL 4288202, at *6 (internal citations omitted, emphases added).

Again, it is a high bar for the plaintiff: as long as one of the reasons advanced by the zoning board for its decisions is deemed a legitimate rational basis, the plaintiff does not have a viable equal protection claim.  *See Harlen Assocs.*, 273 F.3d at 500–01.  Reasons for denial need not be based on expert opinions or scientific calculations to be legitimate.  "Basing a decision on personal experience and observations of the surrounding community is not arbitrary as a matter of law.  A decision can only be considered arbitrary for federal constitutional purposes where ... it has no basis in fact." *Id.*  Enfield's PZC gave multiple reasons for its denial of Pappas' application, based upon professional judgment, personal observations, and public commentary.  The commissioners made their determination after extensive fact finding and deliberation, holding as many as four public hearings. While it is not a purely objective determination based solely on technical standards and

expert opinions, it is, however, not arbitrary for federal constitutional purposes. In fact, as the Second Circuit noted in *Harlen*, "[e]ven if the Board's action were based solely on community opposition, such action would not be unconstitutionally arbitrary if the opposition is based on legitimate state interests such as, *inter alia*, traffic, safety, crime, community pride, or noise." *Id.* at 501 (internal quotation omitted). Enfield's PZC cited several of these legitimate state interests, among others, that are rationally related to the regulatory function of local zoning boards. It has certainly provided sufficient rational basis for its denial of Pappas' application for Constitutional purposes.

There is an important distinction between what is considered arbitrary, capricious and an abuse of discretion as a matter of state law and what lacks rational basis under the Fourteenth Amendment Equal Protection Clause. The two should not be equated, as they are separate determinations for different purposes under different standards and burdens of proof. A state court reviews the local zoning board's decisions for merit. A federal court reviews those decisions for constitutionality. It may be understandable in human nature for a landowner to think that if a zoning board's adverse decision is arbitrary and incorrect, it must be unconstitutional, but that is not the law. It is not the province of federal courts to judge the correctness of local zoning board decision, a task better suited for state courts. The Second Circuit said in *Clubside*: "It is not the role of the federal courts to protect landowners from merely arbitrary actions that are correctable by state remedies ... our analysis does not turn on the outcome of the Article 78 proceeding."[23]  468 F. 3d at 158 (internal

---

[23]It is common for land-use constitutional cases to have state court decisions that either reverse the local zoning board's denial of plaintiff's application or provide support for its approval. Several courts in the Second Circuit have been presented with this issue. *See, e.g.*, *Clubside*, 468 F. 3d at 149 (favorable judgment to plaintiff in state court's Article 78 proceedings); *Harlen Assocs.*, 273 F.3d at 501 n.3 (noting "a trend in the New York state courts

citations omitted); *see also Spiegel v. Adirondack Park Agency*, 662 F. Supp. 2d 243, 258 (N.D.N.Y. 2009) ("*Olech* does not empower federal courts to review government actions for correctness. Rather an *Olech*-type equal protection claim focuses on whether the official[ ] conduct was rationally related to the accomplishment of the work of [the] agency.") (internal citation omitted).

Plaintiff in the case at bar scattered throughout her brief references to her successful litigation in the Connecticut state court, as if that court's judgment in her favor, 2006 WL 3360480, somehow supported her constitutional claim in this federal court. That is not so. I am constrained by governing appellate authority to conclude that a violation of plaintiff's constitutional rights cannot be based, in whole or in part, upon the state court's determination that the initial denial of plaintiff's application was incorrect.

In short, the Court grants summary judgment to defendants on plaintiff's equal protection claim on two grounds: (1) plaintiff has failed to identify similarly situated comparators; and (2) plaintiff has failed to show that Enfield's PZC lacked a rational basis for its decision.

c. Discretionary Government Action

Lastly, the parties' briefs dispute the effect of the Supreme Court's decision in *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591 (2008), on the equal protection claim. The Supreme Court

holding that a lack of support in written studies or expert testimony renders a zoning board's decision subject to annulment as 'arbitrary, capricious and an abuse of discretion' as a matter of state law") (internal citations omitted); *Pansy Road*, 2007 WL 2889456, at *2 (Connecticut Supreme Court "directed the trial court to render a judgment sustaining the plaintiff's appeal" of the local zoning board's decision.) The federal courts have nonetheless consistently declined to give weight to these state court rulings in their constitutional analysis. *See, e.g.*, *Clubside*, 468 F. 3d at 157–58; *Harlen Assocs.*, 273 F.3d at 501 n.3 ("We decline to create by fiat a constitutional requirement that all zoning boards in this Circuit use expert testimony or written studies to support their decisions."); *Pansy Road*, 2007 WL 2889456, at *2–3.

may have added a third prong to the "class of one" analysis in *Enquist*, by suggesting that the offending governmental action be non-discretionary. *See Ruston*, 610 F.3d at 58 n.3. The Court said in *Enquist* that the "class of one" theory of equal protection is not applicable to the public employment context, "[because] some forms of state action ... by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," then noted that a "class of one" challenge may not be appropriate in government actions involving discretionary authority. *Id*. at 603−07; *see Spiegel*, 662 F. Supp. 2d at 257. "[A]llowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Engquist,* 553 U.S. at 603.

Defendants at bar seize upon *Engquist* to argue that no equal protection claim exists in the present case, because the defendants' decision was not made on "a clear standard against which departures, even for a single plaintiff, could be assessed," but instead was by its nature "subjective and individualized." Doc. 75, p. 10 (quoting *Engquist,* 553 U.S. at 602, 604). Plaintiff, in response, cites *Analytical Diagnostic*, 626 F.3d 135, a Second Circuit opinion holding that *Engquist* does not bar all "class of one" claims involving discretionary state action. The question is interesting, but this Court need not decide it in this case. The arguable "government discretion" third prong is irrelevant to the final determination and unnecessary for the disposition of this case.[24] The defendants are

_____

[24]Several other courts in this Circuit have declined to explore the effects of *Engquist*, having already arrived at the conclusion that the plaintiff have failed to adequately allege a "class of one" claim under the standards of similarly situated or rational basis. *See, e.g.*, *Ruston*, 610 F.3d at 58 n.3 ("As we hold that the Rustons have failed to adequately allege a 'class of one' claim regardless of whether the governmental action at issue was non-discretionary we have no need to explore *Engquist*."); *Gryphon*, 2009 WL 4288202, at *4 ("[T]his Court need not attempt to define the scope of the *Engquist* decision today because plaintiff cannot show that its case is identical to those of the parties who were granted the right to hook into the Town's sewer system, and the Town has demonstrated that it acted with a rational basis in denying Gryphon's

entitled to summary judgment because the plaintiff has failed to meet her burden in the "similarly situated" prong, and then again in the "rational basis" prong.  For the reasons stated, those failures are fatal to plaintiff's equal protection claim, however one reads the Supreme Court's decision in *Engquist*.

### C.  *Qualified Immunity*

Public officials are entitled to immunity from civil liability "if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Bizzarro v. Miranda*, 394 F.3d 82, 85‑86 (2d Cir. 2005) (quoting *Poe v. Leonard*, 282 F.3d 123, 132 (2d Cir. 2002)).  For the individual defendants in equal protection cases, the Second Circuit stated in *Bizzaro*: "if plaintiffs' version of the facts reveals that the officials could reasonably have believed they were not violating plaintiffs' constitutional rights, the district court should have granted the motion for summary judgment" to the individual defendants on the basis of qualified immunity. Since this Court has determined that the defendants are entitled to judgment as a matter of law on the plaintiff's equal protection claim, the only remaining claim after this Court's earlier ruling on defendants' Motion to Dismiss [Doc. 51], the question of whether the individual defendants have qualified immunity therefore becomes moot.

---

petition."); *Spiegel*, 662 F. Supp. 2d at 258 ("[An] extension [to consider the rationale of *Enqguist* to bar the plaintiff's claim] is unnecessary for the disposition of this case, because a reasonable jury could not conclude that the Agency lacked a rational basis for its treatment of the Spiegels.").

## V.    **CONCLUSION**

For the foregoing reasons, the defendants' motion for summary judgment with respect to the plaintiff's equal protection claim under the United States Constitution is GRANTED**.**

The plaintiff's other constitutional claims of due process and taking of property have been previously dismissed.   Judgment will enter for the defendants, dismissing the complaint with prejudice.

The Clerk is directed to close the file.

It is SO ORDERED.

Dated:  New Haven, Connecticut
         May 07, 2014


                                   _/s/Charles S. Haight, Jr._____
                                   CHARLES S. HAIGHT, JR.
                                   Senior United States District Judge